Filed 7/29/21  In re W.G. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re W.G. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. S.G. et al., Defendants and Appellants. | E076398 (Super.Ct.Nos. J279105 & J279106) OPINION |

APPEAL from the Superior Court of San Bernardino County.  Annemarie G. Pace, Judge.  Affirmed.

Elizabeth Klippi, under appointment by the Court of Appeal, for Defendant and Appellant S.G.

Jacques Alexander Love, under appointment by the Court of Appeal, for Defendant and Appellant J.C.

1

Michelle D. Blakemore, County Counsel, Jodi L. Doucette, Deputy County Counsel for Plaintiff and Respondent.

J.C. (Mother) and S.G. (Father; collectively, Parents) are the parents of A.G. (female, born 2013) and W.G. (male, born 2015; collectively, the children). Parents appeal from the termination of their parental rights as to the children by the juvenile court at a Welfare and Institutions Code[1] section 366.26 hearing. For the reasons set forth *post*, we shall affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

Prior to this appeal, this dependency case has involved one writ and one appeal. In the writ, case No. E073331, Mother's counsel filed a no issue letter, and we dismissed the writ petition on September 26, 2019. In the appeal, case No. E074791, we upheld the juvenile court's ruling. We ordered the record prepared for Case Nos. E073331 and E074791 to be incorporated into the record in this case.

A.    THE FACTUAL AND PROCEDURAL HISTORY FROM

UNPUBLISHED OPINION IN CASE NO. E074791

"On December 13, 2018, Mother went to work and left W.G. in the care of her boyfriend, F.A. [(Boyfriend)]. Mother and Boyfriend had been together for five months. The other child, A.G., was in school. Boyfriend called Mother and told her he found W.G. burned in the bathtub. Boyfriend stated that 'it was an accident; I didn't do it on purpose.' Boyfriend sent Mother pictures of W.G.'s burn. Mother told Boyfriend to take

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

2

W.G. to the hospital but he convinced her it was not a good idea because she would get her children taken away and he would go to jail. Mother did not leave work, she continued working. When she came home from work, she again told Boyfriend they should take W.G. to the hospital. Again, Boyfriend convinced her not to seek medical care for W.G. Mother was concerned about losing Boyfriend; he paid her car payment. The next day, Boyfriend admitted pouring a cup of boiling water on W.G. Then, when W.G. cried, Boyfriend poured more boiling water and called W.G. a 'crybaby.'

"Mother informed Father about the incident the following day. Father cared for the children every weekend. Father asked Mother to keep W.G. away from Boyfriend but did not ask that W.G. be taken to the hospital. Three days later, Father saw W.G. Father became tearful because of the pain W.G. endured, but did not take W.G. to the hospital or ask Mother to take him. Father did not contact law enforcement.

"On December 18, 2018, W.G. continued to be fussy and in pain. He still was not eating. Mother went to get her hair done and asked the maternal grandmother (MGM) to watch W.G. MGM did not take W.G. to the doctor. When Mother showed her hairstylist pictures of W.G., the hairstylist called [San Bernardino County Children And Family Services (CFS)] about the incident. When Mother returned from her hair appointment, she took W.G. to St. Mary's Hospital because a scab on W.G.'s penis reopened and started to bleed. Dr. Vikram Raj, the treating physician, determined the injuries to W.G. were nonaccidental, and reported the incident. W.G. was transported to Arrowhead Regional Center's Burn Unit. The right side of his face was burned, and he had cigarette

3

burns on his body and face; he had surgery for skin grafts." (*W.G. v. J.C.* (Aug. 24, 2020) 2020 Cal.App.Unpub. LEXIS 5434, *1-3.)

"On December 18, 2018, the children were removed from the care of parents pursuant to a detention affidavit. A.G. was placed with a maternal granduncle (foster father) and grandaunt (foster mother; collectively, foster parents). The plan was for W.G. to be placed in the same home once he was discharged from the medical burn clinic. The foster mother worked for CFS as a supervisor in the Barstow division.

"On December 21, 2018, CFS filed section 300 petitions for serious physical harm, and failure to protect or seek medical care. As to W.G., the petition was filed under section 300, subdivision (a)(1), (b)(2), (b)(3), (b)(4), (e)(5), (e)(6), (g)(7), and (i)(8). As to A.G., the petition was filed under section 300, subdivision (g)(1), (j)(2), and (j)(3). The petitions alleged that W.G. was physically abused because 23 percent of his body was covered in burns, which included cigarette burns, and neither parent obtained proper medical care for him. The children, therefore, were at risk of harm.

"On December 24, 2018, at the detention hearing, the juvenile court read and considered CFS's detention report and its attachments. The court then found that there were no other reasonable means to protect the children without court intervention and detention out of the home of the parents. Parents were awarded supervised visitation once per week for two hours with the children. Preplacement services were also offered to parents. Parents were advised that reunification services may be denied because of the seriousness of the allegations. The court set a jurisdiction and disposition hearing for January 11, 2019." (*W.G. v. J.C.*, supra, 2020 Cal.App.Unpub. LEXIS 5434, *3-4.)

4

"On January 19, 2019, CFS filed its first amended section 300 petitions.

"In the jurisdiction and disposition report dated January 11, 2019, CFS recommended finding the allegations in the petitions as true, denying family reunification services due to the severity of the injuries and the parents failing to seek timely and necessary medical care, and placing the children with the foster parents permanently.

"In the report, the social worker reported that W.G. was interviewed at the Children's Assessment Center (CAC) by the social worker and law enforcement. The social worker asked W.G. about the burn scar on his face. Initially, W.G. shut down; he put his head down, was sad, and had tears in his eyes. He asked for his foster father. W.G. then stated that he had other "owies" on his private part and pointed to it, and on his back. He stated that Boyfriend caused the injuries, and that he cried when Boyfriend poured hot water on his body. W.G. stated he told Mother.

"According to A.G., while she was at school, Boyfriend gave W.G. the 'owies.' She denied that Boyfriend abused her to the social worker. A.G., however, told law enforcement that Boyfriend 'smacked my butt.' She also stated that Mother hit her.

"Mother stated that on December 13, 2018, Boyfriend called her at work and was hysterical, claiming that the injuries to W.G. were an accident. She video-chatted with Boyfriend and saw the burns but stayed at work. Mother claimed that she told Boyfriend to give W.G. some medication and to take him to the hospital. Boyfriend talked Mother out of seeking medical care because he would get in trouble and Mother would have the kids taken away. She did not take W.G. to the hospital when she got home.

"The next day, Boyfriend admitted that he had poured hot water on W.G. in the bath and W.G. started to cry. Boyfriend then poured more water on W.G. because Boyfriend thought W.G. did not like baths.

"On December 15, 2018, MGM saw the burns and inquired about them. Mother stated that she was not taking W.G. to the hospital because she feared the arrest of Boyfriend and the loss of her children. The next day, Mother sent the maternal aunt a picture of W.G.'s burns. Mother also video-chatted with her sister; the sister told Mother to take W.G. to the doctor. Mother did not.

"On December 17, 2018, Father saw the burns on W.G. Although Father was angry at Boyfriend and cried, Father did not take W.G. to seek medical care. He also did not tell Mother to take W.G. to a medical professional.

"The next day, the scab on W.G.'s penis opened and began to bleed. Mother left W.G. with MGM and then went to get her hair done.

"The social worker noted that Mother admitted she and Boyfriend had been together for five months. During the first month of their relationship, Boyfriend punched the wall during an argument and made a hole in the wall. Mother stated that Boyfriend was diagnosed as bipolar and had depression. Mother had a history of domestic violence in a prior relationship where her ex-boyfriend was arrested. As a result of the current events, Mother was booked in jail and had a pending willful child endangerment charge for most of the CFS case.

"On January 4, 2019, the social worker interviewed Father. Father admitted that he did not seek medical care for W.G. even after Father saw the injuries and was shocked

6

when he saw W.G.'s burns. When Father took A.G. to school, he dressed W.G. for the car ride. Father admitted that W.G.'s pants were sticking to his skin because of the burns. Father stated that he did not tell any family members about what happened because he feared that they would lose the kids. Father had previously asked W.G. about Boyfriend. W.G. stated that he was afraid of Boyfriend and would cry. W.G. asked Father not to return him to Mother after staying with Father for the weekend.

"CFS recommended reunification services be denied. The social worker requested a section 366.26 hearing be scheduled, and an adoption assessment be prepared.

"The jurisdiction and disposition hearing was continued until February 28, 2019 because the CAC forensic medical exam report and police report had not been completed. The CAC report was not completed because W.G. was still in the hospital.

"On February 28, 2019, the social worker provided an updated report that included 400 pages of medical documents. Mother had been attending counseling but the report from the counselor lacked information related to the reason for custody. Moreover, although CFS received W.G.'s medical reports, the police report and the forensic report were not completed yet. Therefore, the hearing was continued for April 11, 2019.

"At the hearing on April 11, 2019, CFS submitted an updated report. In the report, the social worker stated that W.G. had surgery for undescended testicles and one testicle had to be removed. The parents were still in counseling, but the CAC had not yet completed a forensic medical exam and the police report had not been submitted. The hearing was continued until May 11, 2019.

"On May 8, 2019, Dr. Siccama completed the CAC forensic medical exam. The police report, however, was still not submitted. In the CAC report, Dr. Siccama noted that W.G.'s wounds were from being 'held in place,' consistent with the boyfriend's statement that he poured scalding water on W.G. 'until he noticed his skin began to come off' and thought he was defecating in the tub. Dr. Siccama determined that W.G. was in serious pain and that Mother and Father prolonged the child's pain by failing to get him medical care. Dr. Siccama also determined that W.G. had 'widespread scarring' with life-long effects. W.G. also had cigarette burns at different stages of healing. The doctor noted that W.G. presented at the hospital with hyponatremia and hypokalemia due to fluid loss from delayed care for the burns.

"When CAC interviewed W.G., he appeared happy and playful. However, when W.G. was questioned about his injuries, he became extremely upset, emotional and tearful. He asked for his foster father. W.G. did not ask for Mother or Father.

"Because the police report had not been filed, the hearing was continued to June 12, 2019.

"CFS filed its addendum report dated June 12, 2019, which included the police report. Mother told the detective that on the day of the incident, right after she arrived at her work, Boyfriend called her over 16 times and texted her 13 times within a half a hour. Boyfriend was watching W.G. at this time. Boyfriend cussed and swore at her and became increasingly abusive and angry because Mother was not answering her phone. Boyfriend believed that she was too busy talking to other men to answer his calls.

8

Boyfriend's fury escalated. He threatened to leave Mother, and to leave W.G. at home alone. During this time, Boyfriend burned W.G.

"Mother told the detective that Boyfriend had been emotionally abusive to W.G.—calling him a 'crybaby,' 'pussy,' 'fag,'' and 'gay.' Mother admitted that Boyfriend had a history of domestic violence in their home and punched a hole in the wall of their bedroom. Mother was aware of Boyfriend's anger issues and that W.G. was afraid of Boyfriend. She, however, continued her relationship with him and took no action.

"Regarding the incident, Mother told MGM that she and Boyfriend 'agreed on everything,' and both agreed not to take W.G. to the hospital. In a text, Mother stated that she did not want to call the cops on Boyfriend 'as what's that gonna do besides put me in more debt because he is taking over the Nissan payment.' Mother recalled seeing a suspicious bruise on W.G.'s ears and knew that he was afraid of Boyfriend. Moreover, Mother admitted that she knew that Boyfriend lost custody of three of his children.

"A search of Boyfriend's phone via a search warrant revealed an image of a juvenile with his pants down on October 25, 2018; Boyfriend lived with Mother and her children during this time. The juvenile's bottom was red, swollen and injured. The juvenile resembled W.G.

"A.G. described the boyfriend hitting Mother and Mother crying. A.G. also stated that Mother left A.G. and W.G. alone at home when Mother went to the store.

"Mother and Boyfriend were charged with willful cruelty to a child, a felony. They were arrested and taken into custody.

"In the updated report, CFS noted that Mother attended counseling and parenting classes since January 23, 2019. The children were doing well in their foster home.

"The hearing was continued to June 19, 2019, to take testimony and to obtain the psychological evaluation of Father.

"At the hearing on June 19, 2019, the juvenile court read and considered the social worker's addendum report and other CFS reports, the police report, the CAC report, the psychological evaluation of Father, and the other attachments.

"Mother conceded the amended petition's section 300, subdivision (a) allegation. She, however, denied having prior knowledge of Boyfriend's propensity to harm her child, the section 300, subdivision (b) allegation. Mother also denied the section 300, subdivision (c) allegation. She claimed that she had been working on services. Mother's counsel admitted that the section 300, subdivision (i) injuries were serious, but denied that Mother had knowledge about the cigarette burns before detention. Counsel also argued that Mother's cooperation with law enforcement should be considered.

"The juvenile court found all the jurisdictional allegations as true in the amended petition. Specifically, the juvenile court stated that the "failure to seek medical attention on its own is enough evidence, frankly, beyond a reasonable doubt." The court also noted the detention report's description of the "social worker's contact with W.G. and how obvious it was to her that he was in extreme pain and kind of gasping because of the pain, and that's after the child was seen by medical professionals." The court stated: "I can only imagine what he was like before that, and for five to six days and at least a couple of days when dad was aware of it. His reaction to those injuries, that he was

10

crying when he saw [W.G.], demonstrates that he knew just how horrible his son was injured—how horribly his son was injured and that he was in extreme pain. [¶] The mother let that go on for far too long, and in fact went to get her hair done instead of worrying about the fact that her child was in this pain."

"Later in the day, the disposition hearing continued with testimony from the psychological evaluator, Dr. Kinsman, as to Father. The hearing was continued to July 24, 2019, to obtain a psychological examination of Mother in addition to other testimony.

"At the July 24, 2019 disposition hearing, the parties stipulated to Dr. Kinsman's psychological report of Mother being admitted into evidence. Although Dr. Kinsman was present and ready to testify, no testimony was requested by the parties. Mother did not testify. No additional evidence was admitted.

"Mother's psychological exam noted that Mother had generalized anxiety disorder, and apparent 'Narcissistic and Antisocial Personality features.' Dr. Kinsman stated that Mother was narcissistic, immature, manipulative, and impulsive; oriented toward self-gratification; inclined to take risks; and made 'efforts to conceal mistakes and to appear more competent than she feels.' As to Mother's ability to self-report, Dr. Kinsman wrote: 'The mother exhibits rigidity and inflexibility in her approach to problems and may not be open to psychological self-evaluation. She's likely to project an exceptionally positive self-image and is intolerant of other's feelings.'

"In the report, Dr. Kinsman determined that Mother's 'children's welfare and safety have not been her paramount consideration.' He stated that providing services to

11

Mother for a minimum of one year would be necessary to prevent the re-abuse of the children.

"The juvenile court, after reading and considering the psychological reports of both parents, the social worker's report of July 24, 2019, other CFS reports, the police reports, and the CAC opinion and attachments, declared the children dependents of the court. The court found that the children's out-of-custody placement was necessary to protect harm, that the parents' efforts have been insufficient to mitigate the reasons for removal, that reunification services are to be denied under section 361.5, subdivision (b)(5) and (b)(6), and a permanent placement hearing under section 366.26 should be set to consider the termination of parental rights. The court stated that the "likelihood of the children being returned safely within 12 months with no continuing supervision is zero." The court then denied reunification services to both parents. The court stated that Mother's failure to provide for the medical care of W.G. was due to her own selfish reasons. The court reduced visits to twice per month, supervised. The court then set a section 366.26 hearing for November 20, 2019.

"On August 2, 2019, Mother and Father filed writs to challenge the setting of a section 366.26 hearing. Mother filed a no-issue writ statement. On September 26, 2019, we dismissed the writ. Mother also filed a Notice of Appeal on August 2, 2019.

"On September 25, 2019, the educational rights of the children were transferred to the foster parents.

"Prior to the section 366.26 hearing scheduled for November 20, 2019, CFS recommended that parents' rights be terminated, and a permanent plan of adoption be

12

implemented.  The children were doing extremely well and had made 'huge' improvements in their placement with the foster/prospective adoptive parents—their great maternal uncle and aunt.  W.G. was still in burn garments and had to have his left testicle removed.  He had nightmares and cried in his sleep, requiring a lot of rocking and consoling.  W.G.'s temper tantrums reduced.  A.G. continued with speech therapy and counseling.  Like W.G., A.G.'s temper tantrums reduced.  Moreover, A.G.'s 'parentification' of W.G. improved.  When A.G. was asked about how A.G. felt about staying with her foster parents until she was grown, she jumped up and down with excitement and stated, 'I want to stay here.'  The children sought out their foster parents for comfort, nurturing, and any other needs.

"Mother continued to visit the children, twice per month.  There were issues regarding structure, routine and supervision.  The foster parents arranged for contact with the children and the other relatives at soccer games, birthday parties, and other family activities, as long as the children were supervised.

"Pursuant to further noticing issues with the Indian Child Welfare Act, the section 366.26 hearing was continued to January 29, 2020.  On January 29, 2020, the hearing was continued to April 14, 2020.

"In the interim, on January 28, 2020, Mother filed a section 388 petition requesting that (1) reunification services be provided for six months for Mother; and (2) other relatives be assessed as prospective adoptive parents.  In support of her section 388 petition, mother attached five exhibits which included: (1) completion certificates for parenting classes; (2) a letter from Mother's counselor dated November 13, 2019, stating

13

that Mother had completed 16 sessions and parenting classes—information that had been provided prior to the June 19, 2019, hearing; (3) a psychological evaluation by Dr. Kinsman that was submitted and considered by the court at the July 24, 2019, disposition hearing; (4) criminal court notes indicating that Mother pled guilty to willful cruelty to a child violation and she received work release; and (5) photographs of Mother with the children.

"On January 29, 2020, the court summarily denied the section 388 petition, stating that the proposed change of order did not promote the best interest of the children. On February 21, 2020, Mother filed a timely notice of appeal from the summary denial of her petition." (*W.G. v. J.C.*, supra, 2020 Cal.App.Unpub. LEXIS 5434, *4-17.)

B.    PERMANENT PLAN HEARING

After we issued our opinion in case No. E074791, and after numerous continuances of the section 366.26 hearing due in part to Covid-19, the juvenile court held a contested section 366.26 hearing on January 5, 2021.

During this period wherein the section 366.26 hearing was continued numerous times, Mother missed events important to the children, such as birthday parties—even when the children requested she attend—because she wanted her visitation time to be just the three of them. Mother did not go to the children's medical appointments. Visits remained regular and consistent. The foster parents stated that Parents still had difficulty parenting and allowed the children to take the lead. Father visited the children consistently and appropriately. Father, unlike Mother, would forego his individual

14

visitation with the children to attend sporting events and birthday parties because the children wanted him at the events.

During this time, another man came forward, after being contacted by Mother, about being the father of W.G. His paternity test came back positive for being W.G.'s biological father. He never had contact with W.G. and is not a party to this appeal.

In the interim, the children were thriving in their placement; they wanted to stay with the foster parents and be adopted by them. The children felt loved, protected, and cared for. The foster parents wanted to adopt the children. The children's therapeutic/emotional, dental, and medical needs were being addressed. The educational rights were transferred to the foster parents for both children.

At the section 366.26 hearing, both Mother and Father testified that A.G. was five years old and W.G. was three when they were detained on December 2018. Mother had taken care of the children since giving birth to them. Both children had a "really good" relationship with her and showed her affection with lots of hugs and kisses while she was raising them. After they were detained, the visits were in-person until Covid-19 restrictions were imposed. They then visited virtually. Near the middle of 2020, the visits were in-person again. The visits reverted back to virtual visits in December 2020 due to new Covid-19 restrictions.

When the visits were in person, they occurred at the foster parents' home. Mother could tell both children still had a positive bond with her through their expressions of love toward her. They still referred to Mother as "mom." At the end of visits, W.G. would throw tantrums, cry, and say that he wanted to stay with Mother. A.G. did not cry

15

as often at the end of visits but stated that she wanted Mother to stay. Mother had not been allowed to attend the children's medical appointments or participate in their nightly routine.

Father testified that prior to the children's removal, he spent about four days a week with them. After the children's removal, Father visited the children twice a month for two hours. He never missed a single visit. The children called him "daddy," and during the visits, they played together. Father also testified that at the end of the visits, W.G. followed Father to his car. Both the children told Father they love him and cried at the end of visits. Father was an active participant in the children's schooling and he would help them with their homework. A.G.'s school was across the street from Father's house. He attended their medical appointments, but was not allowed to attend the appointments after the children's removal.

After the children were removed from Father, he still attended the children's sporting events on the weekends. The last in-person visit he had with the children was in December 2020. He also spoke with the children on Christmas and the children told Father about their presents.

At the conclusion of the hearing, the juvenile court found the children adoptable. Moreover, the court found that although Parents met the first prong of the beneficial parental bond exception, it was foster parents who had provided day-to-day parenting to the children. The court further noted that Parents had not advanced to unsupervised visitation. Therefore, Parents failed to meet their burden that severing their relationship with the children would be so significant to outweigh the benefits the children would

16

derive from adoption. Thereafter, the court terminated the parental rights of both Mother and Father and set adoption as the permanent plan.

On January 8, 2021, Father filed a timely notice of appeal. Father filed this notice in the San Bernardino Superior Court. Father's notice of appeal was received by this court on January 12, 2021. On January 28, 2021, Mother filed a timely notice of appeal.

## DISCUSSION

A. <u>THE JUVENILE COURT PROPERLY FOUND THE PARENTAL EXCEPTION DID NOT APPLY</u>

Both Mother and Father contend that the juvenile court erred in terminating their parental rights because the parental bond exception to the termination of parental rights applied.

This "may be the most unsuccessfully litigated issue in the history of law." (*In re Eileen A. (*2000) 84 Cal.App.4th 1248, 1255, fn. 5, overruled on other grounds in *In re Zeth S. (*2003) 31 Cal.4th 396, 413-414.) While it can have merit in an appropriate case (e.g., *In re S.B.* (2008) 164 Cal.App.4th 289, 296-301), this is not such a case.

### 1. *LEGAL BACKGROUND*

In general, at a section 366.26 hearing, if the juvenile court finds that a child is adoptable it must terminate parental rights. (§ 366.26, subds. (b)(1) & (c)(1).) "To ease the court's difficult task in making this important decision, [section 366.26] provides a carefully calibrated process. Even if a court finds by clear and convincing evidence that the child is likely to be adopted, the parent may avoid termination of parental rights by establishing at least one of a series of enumerated exceptions." *In re Caden C.* (2021) 11

17

Cal.5th 614, 625 (*Caden C.*); see section 366.26, subdivisions (c)(1)(A) and (c)(1)(B)(i) through (vi).) One of the exceptions is the beneficial parental relationship exception; it applies when "termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child **and** the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

Recently, in *Caden C.*, the California Supreme Court explained that from section 366.26, subdivision (c)(1)(B)(i), "we readily discern three elements the parent must prove to establish the exception: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal. 5th at p. 631.) The Supreme Court then went on to note that "[i]n understanding these elements, we are guided by what has become the seminal decision interpreting the exception, the Fourth District Court of Appeal's opinion in *In re Autumn H.* (1994) 27 Cal.App.4th 567 (*Autumn H.*). . . . What the appellate court emphasized in *Autumn H.* is a crucial aspect of the trial court's responsibility in these cases: in assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. [Citation.] By making this decision, the trial court determines whether terminating parental rights serves the child's best interests." (*Id.* at pp. 632-633.)

The Supreme Court recognized that "[s]ubsequent to *Autumn H.*, the Legislature amended the statute to require a parent to show a '*compelling* reason for determining that termination would be detrimental to the child . . . .' (Welf. & Inst. Code, § 366.26, subd.

(c)(1)(B), italics added; see Stats. 1998, ch. 1056, § 17.1.) Based on this amendment, some courts suggested that parents must prove something more than *Autumn H.* required, some heightened level of harm or an additional 'compelling reason.' [Citations.] But closer examination of the legislative history of this amendment reveals the change does not impose an additional or heightened showing. The Legislature added the 'compelling reason' language in section 366.26 and throughout the Welfare and Institutions Code to comply with the new Adoption and Safe Families Act of 1997 (ASFA). [Citation.] That federal statute required a 'compelling reason' in particular situations when an agency didn't move to terminate parental rights, or a court declined to terminate parental rights within specified timeframes. (See. 42 U.S.C. § 675(5)(C), (E)(ii).)" (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) The court then went on to state that "where terminating a child's substantial, positive attachment to the parent would, on balance, be detrimental to the child, that simply is a compelling reason not to terminate parental rights." (*Ibid*, fn. omitted.)

"When applying the beneficial parent-child relationship exception, the court balances the strength and quality of the parent-child relationship in a tenuous placement against the security and sense of belonging that a stable family would confer on the child. If severing the existing parental relationship would deprive the child of 'a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' " (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1234-1235.)

19

" '[F]or the exception to apply, the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt.' " (*In re Jason J. (*2009) 175 Cal.App.4th 922, 938 (*Jason J.*).)  The parent must show more than frequent and loving contact or pleasant visits.  (*In re Dakota H*. (2005) 132 Cal.App.4th 212, 229.)  " 'A biological parent who has failed to reunify with an adoptable child may not derail adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent.  [Citation.]  A child who has been adjudged a dependent of the juvenile court should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be *beneficial to some degree*, but that does not meet the child's need for a parent.' " (*Jason J*., at p. 937.)

### 2.     *STANDARD OF REVIEW*

In *Caden C.*, the Supreme Court granted review to resolve what standard applies in decisions regarding the applicability of the beneficial relationship exception.  (*Caden C.*, *supra*, 11 Cal.5th at p. 639.)

The Supreme Court first explained the three different standards that had developed over the years.  "Many courts review all the trial court's findings for substantial evidence.  [Citation.]  Other courts have suggested that the appropriate standard is abuse of discretion because the 'juvenile court is determining which kind of custody is appropriate for the child.'  [Citation.]  And yet others, including the Court of Appeal in this case, have adopted a 'hybrid' standard.  They review whether there has been regular visitation and whether there is a beneficial relationship for substantial evidence but whether

termination would be detrimental for abuse of discretion." (*Caden C.*, *supra*, 11 Cal.5th at p. 639.)

The Supreme Court then went on to state: "We agree with the general consensus: a substantial evidence standard of review applies to the first two elements. The determination that the parent has visited and maintained contact with the child 'consistently,' taking into account 'the extent permitted by the court's orders' [citation] is essentially a factual determination. It's likewise essentially a factual determination whether the relationship is such that the child would benefit from continuing it." (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.)

The court then went onto the third element: "The third element—whether termination of parental rights would be detrimental to the child—is somewhat different. As in assessing visitation and the relationship between parent and child, the court must make a series of factual determinations. These may range from the specific features of the child's relationship with the parent and the harm that would come from losing those specific features to a higher-level conclusion of how harmful in total that loss would be. The court must also determine, for the particular child, how a prospective adoptive placement may offset and even counterbalance those harms. In so doing, it may make explicit or implicit findings ranging from specific benefits related to the child's specific characteristics up to a higher-level conclusion about the benefit of adoption all told. All these factual determinations are properly reviewed for substantial evidence." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)

However, the Supreme Court noted that "the court must also engage in a delicate balancing of these determinations as part of assessing the likely course of a future situation that's inherently uncertain. . . . The court makes the assessment by weighing the harm of losing the relationship against the benefits of placement in a new, adoptive home. And so, the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)

Under the substantial evidence standard of review, "a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.] The determinations should be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' [Citations.] Uncontradicted testimony rejected by the trial court ' "cannot be credited on appeal unless, in view of the whole record, it is clear, positive, and of such a nature that it cannot rationally be disbelieved." ' " (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)

As for the abuse of discretion standard, the Supreme Court stated that "[a] court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' [Citation.] But, ' " '[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " ' " (*Caden C.*, *supra*, 11 Cal.5th at p. 641.)

In sum, the Supreme Court noted that "[w]hile each standard here fits a distinct type of determination under review, the practical difference between the standards is not likely to be very pronounced. Review for substantial evidence applies to factual determinations; abuse of discretion applies when a lower court must delicately balance factual determinations to assess an uncertain future situation. But where, as with the parental-benefit exception, 'the appellate court will be evaluating the *factual basis* for an exercise of discretion, there likely will be no practical difference in application of the two standards.' [Citations.] At its core, the hybrid standard we now endorse simply embodies the principle that '[t]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 641.)

### 3. *ANALYSIS*

In this case, parents argue that the juvenile court's termination order should be reversed because they had positive bonds with the children and the children would benefit from continuing their relationship with parents.

We first address Mother's argument. Mother contends that the children would benefit from continuing their relationship with Mother. Mother stated: "The children's strong bond with their mother started when mother raised them from birth—to five years old for A.G. and to three years old for W.G. After being detained, the children continued contact with their mother through weekly supervised visitation." We agree that Mother and the children share a bond, and that Mother maintained contact with the children.

This goes to the first prong of the beneficial exception test. Here, the court agreed that the parties have a shared bond. However, as noted *ante*, " 'for the exception to apply, the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt.' " (*Jason J.*, *supra*, 175 Cal.App.4th at p. 938.)

In this case, at the time of the section 366.26 hearing, the children were placed in foster parents' home for two and a half years. There, the evidence showed that the children had a loving and stable placement who had cared for the children since their detention out of home. Foster parents had assumed full parental responsibilities and care of the children, including educational responsibilities. CFS reported that there was no doubt that the children and the foster parents shared a strong bond with each other. Moreover, the foster parents addressed the children's severe dental problems and all medical needs. They enrolled the children in therapy, sports, and extracurricular activities. They also enrolled W.G. in preschool and A.G. in speech therapy. When W.G. often had nightmares and cried in his sleep, the foster parents rocked and consoled him back to sleep. While living in their home, W.G.'s temper tantrums decreased. The foster parents ensured that the children felt like they were part of the family. In return, the children went to them for comfort, nurture, and to have their needs met. The children were reported to be happy and content. When A.G. was asked how A.G. felt about staying with the foster parents until she was grown, she jumped up and down with excitement.

Although Mother shared a bond with the children, she did not participate in the day-to-day care of the children. At the section 366.26 hearing, Mother admitted that she did not know the children's teachers' names. Moreover, Mother had not graduated to unsupervised visits with the children; hence, she never had to care for the children on her own. She also did not go to medical appointments, therapy sessions, or other appointments the children had. Furthermore, although Mother was invited to the children's sporting events and birthday parties, she refused to attend because she only wanted to spend time with the children one on one—even though the children wanted her to attend. This behavior showed that Mother was only concerned about her needs, and not about the wants and desires of her children.

The parent must show more than frequent and loving contact or pleasant visits. (*In re Dakota H.*, *supra*, 132 Cal.App.4th at p. 229.) " 'A biological parent who has failed to reunify with an adoptable child may not derail adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent. [Citation.] A child who has been adjudged a dependent of the juvenile court should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be *beneficial to some degree*, but that does not meet the child's need for a parent.' " (*Jason J.*, at p. 937.)

As provided in detail above, we, as a reviewing court, cannot substitute our own judgment as to what is in the children's best interests. (*Caden C.*, *supra*, 11 Cal.5th at p. 641.) Here, substantial evidence supports the court's finding that Mother has failed to demonstrate that the children would benefit from continuing a relationship with Mother.

Therefore, we discern no abuse of discretion in terminating Mother's parental rights because the beneficial relationship except did not apply.

Next, we address Father's arguments. Similar to Mother's contentions, Father argues that the court erred in terminating his parent rights because the beneficial relationship exception should have been applied. Father's argument also fails. As noted above, the court found that Parents had a bond with the children. Therefore, we again address only the second-prong of the beneficial relationship exception.[2]

We note CFS argues that "in this appeal, father's rights are not at issue." CFS goes on to state that because Mother "failed to request Judicial Notice of the appeal brief by Father, which is fundamentally fatal," it would not address Mother's adoption of Father's arguments. Father, however, did file a notice of appeal—first in the superior court on January 8, 2021, which was then received by this court on January 12, 2021, and assigned the same appellate case number, case No. E076398. Thereafter, Father filed his opening brief on March 15, 2021. Thus we fail to see how Father's appeal is "fundamentally fatal." In his reply brief, Father is similarly perplexed by CFS's

---

[2] We note that in its initial brief, CFS argued that "in this appeal, father's rights are not at issue." CFS went on to state that because Mother "failed to request Judicial Notice of the appeal brief by Father, which is fundamentally fatal," it would not address Mother's adoption of Father's arguments. Father, however, did file a notice of appeal— first in the superior court on January 8, 2021, which was then received by this court on January 12, 2021, and assigned the same appellate case number, case No. E076398. Thereafter, Father filed his opening brief on March 15, 2021. On May 28, 2021, CFS filed a motion for leave of court to serve and file a respondent's brief to address Father's appeal. On June 2, 2021, we granted the motion and noted, "In the future, San Bernardino County Children and Family Services should file one respondent's brief in response to all appellants' opening briefs."

response. Consequently, Father "requests this court [to] consider co-appellant father's appeal solely on the record, appellant's opening brief and this reply brief, and respondent be prohibited from seeking oral argument as related to father. (See California Rules of Court, rules 8.412(d)(1), 8.416(g) and 8.202(a)(2).)" By failing to address Father's arguments on appeal, CFS has forfeited its right to bring forth arguments regarding Father.

Here, Father argues that the exception should apply because Father never missed a visit during the entirety of the case, and was consistently and appropriate in the visits. Moreover, Father was willing to pass up his individual visitations with the children because the children wanted Father to attend their various extracurricular activities instead. Father put the needs of the children above his own. Furthermore, the children called him "daddy" and cried when their visitations ended. W.G. would follow Father outside to the car because he wanted to go home with Father. They were all very affectionate with each other.

We agree the evidence provided by Father shows that the children and Father enjoy a special bond and Father cared about the children. On appeal, however, we have to determine whether substantial evidence supports the court's finding that the children would not benefit from continuing a relationship with Father. Here, we find that substantial evidence supports the juvenile court's finding Father has failed to demonstrate that the children would benefit from continuing a relationship with Father.

As we noted with Mother, Father did not participate in the day-to-day care of the children. Father, unlike Mother, did attend the children's extracurricular activities.

Nonetheless, we note that Father had not visited the children unsupervised or had them in his home after they became dependents of the court. Although Father has demonstrated that he has maintained contact with the children as permitted, he failed to show that the children would benefit from continuing the relationship and that they would be greatly harmed should parental rights terminate. As previously stated, "the parent must show more than frequent and loving contact or pleasant visits. [Citation.] 'Interaction between natural parent and child will always confer some incidental benefit to the child. . . . The relationship arises from day-to-day interaction, companionship and shared experiences. [Citation.]' [Citation.] The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment from child to parent." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 953-954, quoting *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) The second requirement for the parental benefit exception to apply requires that Father prove that the children would benefit from continuing the relationship. (§ 366.26, subd. (c)(1)(A).) "The existence of this relationship is determined by '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1206, quoting *Autumn H.* at p. 576.) Again, " 'for the exception to apply, the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt.' " (*Jason J.*, *supra*, 175 Cal.App.4th at p. 938.)

Here, while Father visited with the children, the foster parents took care of the daily parenting of homework, meals and discipline. They provided stability and permanence for the children. Moreover, application of the beneficial relationship exception requires the parent to show "more than the relationship is 'beneficial.' " (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52, fn. 4.) The parent must demonstrate the relationship " 'promote[s] the well-being of the child to such a degree that it outweighs the well-being the child would gain in a permanent home with new, adoptive parents.' " (*Ibid.*; see also *In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324 [parent must occupy more than a "pleasant place" in the child's life for the beneficial relationship exception to apply]; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419 [beneficial relationship exception did not apply; loss of mere "frequent and loving" contact with parent was insufficient to show detriment from termination of parental rights].)

*In re G.B.* (2014) 227 Cal.App.4th 1147, is instructive. In that case, the appellate court determined substantial evidence supported the juvenile court's order that the beneficial-relationship exception did not apply. There, the court observed that the mother had failed to meet her burden. Similar to this case, in *In re G.B.*, there was evidence that the mother's visits with the children went well and that her children had positive reactions to her during the visits. The court, however, noted that the juvenile court's order will be affirmed "if supported by substantial evidence, even if other evidence supports contrary conclusion." The appellate court stated that "this evidence fell short of establishing that mother's relationship with her children promoted their well-being to such an extent that it outweighed the well-being the children would gain in a permanent

29

home with adoptive parents. [Citation.] Mother's visits with her children were always supervised, mother was only at the beginning stages of working on the effects of domestic violence in her life, and there was still instability and dysfunction surrounding her relationship with father. By contrast, the children were in a secure placement and were bonded with their current and prospective caregivers." (*Id*. at p. 1166.) Similar to *In re G.B.*, Parents' relationships with the children does not outweigh the well-being the children would gain in a stable, permanent and loving home with their foster parents.

In this case, we agree with the juvenile court that although the children shared a bond with both Father and Mother, severing that bond would not be detrimental to the children. Again, as noted above, the relative caretakers provided for the physical and emotional needs of the children. Although the children were happy to see Father at the visits they were also happy to see and spend time with the foster parents. Additionally, Father's and Mother's visits never became unsupervised. The beneficial exception is "difficult to make in the situation, such as the one here, where the parents have [not] advanced beyond supervised visitation." (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 51.)

In conclusion, we note that the juvenile court agreed with parents that both Mother and Father had positive bonds with the children. As noted above, the court stated that "[t]here is no doubt that both parents love the children very much, and that that is mutual that there is love and affection from the children to the parents as well." The court, however, found that Parents failed to establish the second prong of the beneficial exception to apply. The court noted that the children had been removed for two years

after "extremely significant injury to [W.G.] and the delay in medical care to him that caused him extreme suffering." The court went on to state that the children had been placed together and there was evidence "that they are thriving in placement with these relatives. And as far as day-to-day parenting, it's the [foster parents] who have provided that for two years. And the parents contact has always been supervised. [¶] So when looking at a five and seven-year-old, and the benefits of permanency, [A.G.'s] own statements, the report which demonstrates that the children do look to the relative caretakers for comfort and support, I'm weighing that heavily in making the determination that the parents have not met the burden to demonstrate that severing the parental bond would be so significant that I shouldn't make that determination, which is the preference under the law. [¶] So I am going to terminate parental rights."

As stated previously, under the hybrid standard of review outlined in *Caden C.*, *supra*, 11 Cal.5th 614, section 366.26 " 'does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 641.) Under the standard of review outlined, we are bound by the juvenile court's factual findings if supported by substantial evidence.

Here, we find that there is substantial evidence to support the juvenile court's finding that parents failed to establish the beneficial parental relationship exception applied in this case. There was insufficient evidence the children would benefit more from continuing their relationship with mother and father than from adoption. Therefore,

31

we find that the juvenile court did not abuse its discretion in finding that the parental benefit exception did not apply.

## DISPOSITION

The juvenile court's findings and orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
J.

I concur:

McKINSTER
Acting P. J.

32

[*In re W.G et al.*, E076398]

FIELDS, J.

I fully concur in the majority's determination that "there is substantial evidence to support the juvenile court's finding that parents failed to establish the beneficial parental relationship exception applied in this case," and that "[t]here was insufficient evidence the children would benefit more from continuing their relationship with mother and father than from adoption." However, I write separately to address the majority's requirement that the parents prove that they occupied a parental role in the lives of the children for the parental-benefit exception to apply. After, *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), I no longer believe that a parent must show that he or she occupied a "parental role" in the child's life.

In applying the parental-benefit exception, courts have traditionally required the parent to show that the parent occupies a " 'parental role' in the child's life." (E.g., *In re Derek W.* (1999) 73 Cal.App.4th 823, 827.) This required showing is based on *Autumn H.*, where the court observed, "[t]he exception applies only where the court finds regular visits and contact have continued or developed *a significant*, *positive*, *emotional attachment from child to parent*." (*Autumn H.* (1994) 27 Cal.App.4th 567, 575, italics added; e.g., *In re Derek W.*, at p. 827; *In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419.) *Caden C.* did not change the requirement that parents show their regular visits and contact resulted in a significant, positive emotional attachment from parent to child.

1

However, *Caden C.* did not define that attachment to mean that the parent must occupy a parental role in the child's life.

According to *Caden C.*, a parent must show three things in order for the parental-benefit exception to apply: "The parent must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. When the parent has met that burden, the parental-benefit exception applies such that it would not be in the best interest of the child to terminate parental rights, and the court should select a permanent plan other than adoption." (*Caden C.*, *supra*, 11 Cal.5th at pp. 636-637.)

In discussing the parental-benefit exception, *Caden C.* did not mention any requirement that a parent show that the parent occupies a parental role in the child's life. (*Caden C.*, *supra*, 11 Cal.5th at pp. 631-632.) Regarding the second element of the exception, *Caden C.* emphasized that the focus is on the child, and that courts "assess whether 'the child would benefit from continuing the relationship.' (§ 366.26, subd. (c)(1)(B)(i).)" (*Id.* at p. 632.) Among other things, *Caden* C. observed that " 'parenting styles and relationships differ greatly between families,' " and that *Autumn H.*, which guided the court's analysis of the exception, " 'does not narrowly define or specifically identify the type of relationship necessary to establish the

2

exception.' " (*Caden C.*, at pp. 632-633.)  The Supreme Court's approach in *Caden C.* is inconsistent with a mandate that the parents show they occupy a parental role in the child's life.  According to *Caden C.*, what must be shown is "that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C.*, at p. 636.)  *Caden C.* specifically held that it is not necessary to calibrate the nature of that relationship:  "Certainly, it is not necessary—even if it were possible—to calibrate a precise 'quantitative measurement of the specific amount of "comfort, nourishment or physical care" [the parent] provided during [his or] her weekly visits.' " (*Caden C.*, at p. 632.)  In light of the *Caden C.*'s articulation of the applicability of the parental-benefit exception, I no longer believe that it is necessary that a parent show that he or she occupied a parental role in the child's life.  Often, such a requirement is virtually impossible to fulfill in light of the custody and visitation orders of the court.

FIELDS _____

J.